UNITED STATES, Appellee,

v.

John BOROWSKI, et al., Defendants,
Appellants.

No. 90–2133.

United States Court of Appeals,
First Circuit.

Heard July 27, 1992.
Decided Oct. 7, 1992.

John Foskett with whom Steven J. Brooks, Daniel R. Deutsch and Deutsch Williams Brooks DeRensis Holland & Drachman, P.C., Boston, Mass., were on brief for defendants, appellants.

Richard E. Welch, III, Asst. U.S. Atty., with whom A. John Pappalardo, U.S. Atty., and Peter W. Kenyon, Sp. Asst. U.S. Atty., Boston, Mass., were on brief, for appellee.

Before TORRUELLA and STAHL, Circuit Judges, and HORNBY,* District Judge.

HORNBY, District Judge.

Congress enacted the Clean Water Act "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251 (1988). As one means of improving water quality, Congress ordered the Environmental Protection Agency (EPA) to design pretreatment standards for industrial waste discharges into publicly-owned treatment works. 33 U.S.C. § 1317(b). Under the Act, someone who knowingly violates these standards and knows that he or she thereby places another person in imminent danger of death or serious injury commits a felony. 33 U.S.C. § 1319(c)(3) (1988 &

* Of the District of Maine, sitting by designation.

Supp. II 1990). Does this criminal sanction apply when the imminent danger is not to people at the publicly-owned treatment works, municipal sewers or other downstream locations affected by the illegal discharge, but rather to employees handling the pollutants on the premises from which the illegal discharge originates? We hold that it does not.

### Facts

The defendant John Borowski was the President and owner of Borjohn Optical Technology, Inc. and Galaxie Laboratory, Inc. ("Borjohn"). Borjohn operated a manufacturing facility in Burlington, Massachusetts, producing optical mirrors for use in aerospace guidance and sighting systems.[1]

Borjohn used various rinses, dips and nickel plating baths to plate nickel onto its mirrors. When a mirror was improperly plated, Borjohn used a nitric acid bath to strip the nickel off. From time to time the nickel plating solutions and nitric acid stripping baths had to be replaced.

Borjohn disposed of its spent nickel plating baths and nitric acid baths by crudely dumping them directly into plating room sinks, without any form of pretreatment. Those sinks drained immediately into Borjohn's underground pipes which, at the property border line, fed into the Burlington municipal sewer system and from there into the Massachusetts Water Resource Authority's treatment works. Because the pollutants were ultimately discharged into a publicly-owned treatment works, Borjohn was subject to the EPA's pretreatment regulations. The EPA regulations prohibited nickel discharges into the publicly-owned treatment works in amounts exceeding 3.98 milligrams per liter and also prohibited concentrations of nitric acid discharges into the publicly-owned treatment works if they had a pH balance of less than 5. *See* 40 C.F.R. §§ 433.17(a), § 403.5(b)(2) (1991). The nickel and nitric acid baths Borjohn discharged greatly exceeded these pretreatment standards.

According to medical experts, enormous health concerns are associated with exposure to nitric acid and nickel in the amounts involved here. Contact with the chemicals causes severe allergic reactions, chemical burns, serious skin disorders such as rashes and dermatitis, and cancer. Inhalation of nickel vapors and nitric acid fumes can cause breathing problems, nasal bleeding and serious damage to a person's respiratory tract. Various Borjohn employees testified to symptoms consistent with these health problems. Employees testified to having had "daily nose bleeds," headaches, chest pains, breathing difficulties, dizziness, rashes and blisters.

Repeated employee exposure to the chemicals was unavoidable. In discharging the spent nickel plating baths and nitric acid baths, for instance, Borjohn employees were told to bail out the harmful solutions by hand using a plastic bucket or a portable pump. Once a tank was nearly empty it was tipped over the edge of the sink and a scoop or small cup was used to scoop out any remaining solution. The employees were required to scrape the sides and bottom of nickel baths to extricate a layer of nickel byproduct called "extraneous plate out." Sometimes employees were told to dump "hot" nitric acid solutions into the sinks. This created an "alka seltzer" like appearance on the surface of the sink. Employees testified that the nickel and nitric acid solutions sometimes splashed and spilled directly onto their skins. Indeed, one employee complained that he was always "wet" with the solution and at times was scalded by the chemicals.

The protective gear available to Borjohn employees was grossly inadequate to protect them against exposure. Moreover, the nickel waste discharges produced "nickel mists or vapors" and the nitric acid disposal gave off "reddish-brown fumes." Ventilation at the plating room was seriously deficient and no suitable respirator was provided to the employees.

---

1. We set forth the facts most favorable to the Government. *See United States v. Angiulo,* 897 F.2d 1169, 1197 (1st Cir.), *cert. denied,* — U.S. ——, 111 S.Ct. 130, 112 L.Ed.2d 98 (1990).

Borjohn and Borowski knew that their practices created serious health risks to the employees. Borowski was in charge of the plating room, participated in the disposal practices and personally ordered Borjohn employees to do likewise. The original containers carrying the nickel and nitric acid had warning labels about the dangers of contact with the substances. The defendants routinely received Material Safety Data Sheets from the chemical suppliers warning of the dangers associated with exposure. Borowski and Borjohn were also aware that their disposal practices violated the EPA's pretreatment regulations. Borjohn employees complained to Borowski about the dangers of their disposal practices and about the numerous health problems they were experiencing.

On April 4, 1990, Borjohn and Borowski were indicted on two counts (one for nickel and one for nitric acid) of violating the Federal Clean Water Act's knowing endangerment felony provision, 33 U.S.C. § 1319(c)(3). The indictment alleged that from February 5, 1987, to July, 1988, Borjohn and Borowski knowingly discharged the contents of nickel plating baths and nitric acid baths into Burlington's sewer system and the Massachusetts Water Resource Authority's publicly-owned treatment works; that these baths contained nickel and nitric acid in amounts exceeding the EPA's pretreatment standards, 40 C.F.R. §§ 433.17(a), 403.5(b)(2); and that Borjohn and Borowski knew at the time that they were thereby placing Borjohn employees in imminent danger of death or serious bodily injury. Borjohn and Borow-

ski moved to dismiss the indictment on the same ground as is at issue here. That motion, along with a later motion for acquittal, was denied. On May 23, 1990, after 18 days of trial, a jury returned guilty verdicts against both defendants on both counts. The United States Attorney presented no evidence of danger to anyone other than Borjohn employees.

### Discussion

Section 1317(b) of the Clean Water Act directs the EPA to promulgate pretreatment standards for pollutants going into publicly-owned treatment works.[2] Subsection (d) prohibits the owner or operator of any source (a term that includes Borjohn and Borowski) from violating these standards. Section 1319(c)(3)(A) provides that anyone who "knowingly violates section ... 1317 ..., and who knows at that time that he thereby places another person in imminent danger of death or serious bodily injury" is guilty of a felony.[3]

We assume for purposes of this appeal that both defendants knowingly violated § 1317 and knew of the dangers to the Borjohn employees.[4] It is undisputed that Borjohn employees were placed in imminent danger of serious bodily injury during their employment and that some of this danger occurred at the time of dumping chemical solutions into sinks that ultimately led to a publicly-owned treatment works. The question is whether the defendants, in knowingly violating § 1317, knew that they "thereby" placed the employees in imminent danger.

---

**2.** Specifically, the EPA is to promulgate:

regulations establishing pretreatment standards for introduction of pollutants into treatment works ... which are publicly owned for those pollutants which are determined not to be susceptible to treatment by such treatment works or which would interfere with the operation of such treatment works.... Pretreatment standards under this subsection ... shall be established to prevent the discharge of any pollutant through treatment works ... which are publicly owned, which pollutant interferes with, passes through, or otherwise is incompatible with such works.

33 U.S.C. § 1317(b).

**3.** Knowing endangerment. (A) General rule. Any person who knowingly violates section ... 1317 ..., and who knows at that time that he thereby places another person in imminent danger of death or serious bodily injury, shall, upon conviction, be subject to a fine of not more than $250,000 or imprisonment of not more than 15 years, or both. A person which is an organization shall, upon conviction of violating this subparagraph, be subject to a fine of not more than $1,000,000.

33 U.S.C. § 1319(c)(3).

**4.** Because of our disposition, we do not address Borowski's claim that his emotional status impaired his ability to meet the statutory standard of intent.

There is no single correct answer to this semantic puzzle. In one sense, it can be said that the knowing violation "thereby" placed the employees in danger. After all, the defendants knew that the sinks were connected to the publicly-owned sewer and treatment works and that the wastes would therefore illegally proceed without interruption to the publicly-owned treatment works. They also knew that the employees' actions in performing the dumping as instructed placed them in imminent danger. Arguably, therefore, through the knowing violation the defendants "thereby" endangered the employees. On the other hand, there could be no violation unless the wastes ultimately ended up in a publicly-owned sewer and treatment works.[5] But the risks and dangers to these employees would have been the same if the plugs had always remained in the sinks so that no discharge to the publicly-owned treatment works (and therefore no § 1317 violation) ever occurred. The danger to the employees was inherent in their handling of the various chemical solutions, solutions that were part of the defendant's manufacturing process. They would have been subject to the identical hazards had they been dumping the chemicals into drums or other containers for appropriate treatment under the Act. In that respect, therefore, although the defendants knew that their employees were placed in imminent danger,

that danger was not caused by the knowing violation of § 1317.

■ Since semantic analysis alone is insufficient, how is this puzzle to be resolved? Several factors assist us. First, the purpose of the statute is clear. The Clean Water Act is not a statute designed to provide protection to industrial employees who work with hazardous substances. Instead, section 1251(a) states: "The objective of this Act is to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." The EPA is directed to promulgate pretreatment standards only so as to "prevent the discharge of any pollutant" that will pass through publicly-owned treatment works, interfere with the works, be incompatible with the works, 33 U.S.C. § 1317(b), or otherwise violate effluent standards for the works. 33 U.S.C. § 1317(c). The EPA regulations reflect this same focus of concern on publicly-owned treatment works. The regulations' goals are:

(a) To prevent the introduction of pollutants into POTWs which will interfere with the operation of a POTW, including interference with its use or disposal of municipal sludge;

(b) To prevent the introduction of pollutants into POTWs which will pass through the treatment works or other-

---

5. From an abundance of caution, we point out that the publicly-owned portion of the treatment works and its appurtenances ended at the boundary between the street and the defendants' private real estate. The United States Attorney admits this in the written brief but certain comments at oral argument might be construed as asserting that the publicly-owned treatment works extends through Borjohn's own pipes right up to the sink drain where the defendants dumped the materials. Section 1292 is the definitional term of the statute. It gives a broad definition to the term "treatment works" to include various appurtenances to a municipal sewage treatment plant. 33 U.S.C. § 1292(2). The section with which we are concerned, however—§ 1317(b)—limits its scope to "the discharge of any pollutant through treatment works (as defined in section 1292 of this title) *which are publicly owned ...*" (emphasis supplied). In its regulations, the EPA has defined the term "publicly-owned treatment works" consistently with the statute. Specifically, the term "means a treatment works as defined by section

212 of the Act [33 U.S.C. § 1292], *which is owned by a state or municipality....*" 40 C.F.R. § 403.3(O) (emphasis supplied). That definition goes on to provide that the term "includes sewers, pipes and other conveyances only if they convey waste water to a POTW treatment plant." *Id.* We read this language to refer to such sewers, pipes and other conveyances that are publicly owned. Here, for example, the City of Burlington's sewer is included in the definition because it conveys waste water to the Massachusetts Water Resource Authority's treatment works. There is no suggestion in this short sentence in the regulations that the EPA also intended to make private pipes on private land part of a "publicly-owned treatment works." Indeed, part of the significance of the definition of what is public relates to allocation of costs so that federal funding for capital costs of publicly-owned systems can be recovered from industrial users. 33 U.S.C. §§ 1281–87; S.Rep. No. 414, 92nd Cong.2d Sess. (1972), *reprinted in* 1972 U.S.C.C.A.N. 3669, 3695–96.

wise be incompatible with such works; and

(c) To improve opportunities to recycle and reclaim municipal and industrial wastewaters and sludges.

40 C.F.R. § 403.2.[6] One can read the entire statute and regulations in vain for any protection mechanism for industrial employees who work with wastes at the point of discharge.[7] Instead, other laws deal with industrial employee health and safety. The Occupational Safety and Health Act (OSHA) is the best known. 29 U.S.C. §§ 651 *et seq.* (1988 & Supp. II 1990). It carries extensive remedial provisions, including administrative steps by which unsafe employer practices can be halted on short notice. *See, e.g.,* 29 U.S.C. §§ 657–59, 662, 666. To be sure, it does not carry criminal penalties for unsafe practices unless a death occurs, *see* 29 U.S.C. § 666, but the sanction of its fines and the administrative remedies available to OSHA are well known throughout the industrial workplace.

Second, Congress has passed a separate law dealing with the general handling, treatment and storage of hazardous substances. Specifically, the Resource Conservation and Recovery Act (RCRA) is a cradle-to-grave statute providing a full range of remedies designed to protect both health and the environment. *See* 42 U.S.C. § 6902 (1988). The Clean Water Act, on the other hand, is not directed at the *handling* of pollutants. Indeed, under the Clean Water Act, if the publicly-owned treatment works were itself capable of removing the nickel and acid from Borjohn's discharges (thereby satisfying Clean Water Act goals), the works could seek to avoid the prohibition placed on Borjohn's discharge, 33 U.S.C. § 1317(b)(1)—yet the health hazard to the employees would obviously remain the same.[8] Moreover, unlike the Clean Water Act, RCRA exhibits explicit concern for industrial health. It has a provision specifically requiring the EPA to provide information about employee hazards to the Secretary of Labor and OSHA for OSHA enforcement purposes. 42 U.S.C. § 6971(f). The Clean Water Act exhibits no equivalent concern for workplace dangers. 33 U.S.C. § 1367 (employee protection provisions limited to remedies against retaliation).

■ Finally, the well-known rule of lenity in applying criminal statutes applies

---

**6.** According to another statement, the regulations establish "responsibilities of Federal, State, and local government, industry and the public to implement National Pretreatment Standards to control pollutants which pass through or interfere with treatment processes in Publicly Owned Treatment Works (POTWs) or which *may contaminate sewage sludge.*" 40 C.F.R. § 403.1(a).

**7.** Any concern for employees reflected in the regulations deals with "downstream" employees, *i.e., employees of the publicly-owned works.* *See* 40 C.F.R. § 403.5(b)(7) (prohibiting "[p]ollutants which result in the presence of toxic gases, vapors, or fumes *within the POTW* in a quantity that may cause acute worker health and safety problems") (emphasis supplied).

At only three other points do the regulations reflect concern with health. First, 40 C.F.R. § 403.8(f)(1)(vi)(B) provides:

*The POTW* shall have authority and procedures (after informal notice to the discharger) immediately and effectively to halt or prevent any discharge of pollutants *to the POTW* which reasonably appears to present an imminent endangerment to the health or welfare of persons

(emphasis supplied). This provision apparently permits a municipal works to take steps to pre-vent a discharge from reaching it. The danger contemplated, therefore, is to persons who would be endangered once the discharge reaches the municipal sewers or works. Second, 40 C.F.R. § 403.8(f)(2)(vii)(C) lists as a "significant noncompliance" any discharge that causes "interference or pass through (including endangering the health of POTW personnel or the general public)." Conspicuously missing is any reference to source employees. Third, the very next sentence lists as a significant noncompliance "[a]ny discharge of a pollutant that has caused imminent endangerment to human health, welfare or to the environment...." 40 C.F.R. § 403.8(f)(2)(vii)(D). "Discharge" is defined as "the introduction of pollutants into a POTW...." 40 C.F.R. § 403.3(g). The concern again, therefore, is for "downstream" effects.

None of these regulations was referred to by either the United States Attorney's Office or the defendants.

**8.** Conversely, there may be remedial measures (proper respirators and ventilation, protective clothing and procedures) that could alleviate the health risks to the workers, yet have no value in addressing Clean Water Act concerns of cleaning up the discharges.

here. Where there is ambiguity in a criminal statute, the ambiguity is to be construed in favor of the defendant. *See, e.g., Hughey v. United States,* 495 U.S. 411, 422, 110 S.Ct. 1979, 1985, 109 L.Ed.2d 408 (1990); *United States v. Anzalone,* 766 F.2d 676, 680 (1st Cir.1985).[9] Our initial semantic exercise reveals the ambiguity in this statute.

■ These three factors lead us to conclude that a knowing endangerment prosecution cannot be premised upon danger that occurs before the pollutant reaches a publicly-owned sewer or treatment works. Section 1319(c)(3)(A) therefore does not apply to the defendants' conduct as set forth in this indictment.

The United States Attorney argues that only under his interpretation of the statute does a separate provision of the Act have any meaning. We must, of course, interpret a statute so as to give effect to all its terms. *See Wadsworth v. Whaland,* 562 F.2d 70, 78 (1st Cir.1977), *cert. denied,* 435 U.S. 980, 98 S.Ct. 1630, 56 L.Ed.2d 72 (1978). We therefore examine this argument. Section 1319(c)(3)(B)(ii) provides that it is a defense to prosecution if the charged conduct "was consented to by the person endangered and . . . the danger and conduct charged were reasonably foreseeable hazards" of a particular business, occupation or profession. The United States Attorney argues that the only people who could be "endangered" and yet consent to such hazards are employees of an illegal discharger. Thus, the United States Attorney concludes that the statute envisions criminal liability for the illegal discharger who endangers his employees. We find the premise to be faulty. In the course of ordinary industrial activity, illegal discharges will undoubtedly occur from time to time (human or mechanical failure) that the industrial manufacturer or other entity physically cannot correct or halt immediately. Such an entity, if it is also a good citizen, will inform the publicly-owned treatment works of the discharge so that any corrective steps possible can be taken downstream. These publicly-owned treatment works may then hire professional consultants to advise the publicly-owned treatment works how to handle these fully disclosed but illegal discharges until they are corrected or halted. These "downstream" actors—consciously and freely dealing with illegal substances after they have reached the publicly-owned sewers or treatment works—are legitimate subjects for the affirmative defense and give it appropriate content. The section does not, therefore, require us to give section 1319 the reading the United States Attorney urges, a reading that is inconsistent with the overall thrust of the Clean Water Act.

### Conclusion

The endangered persons on whom this prosecution is based had no connection to the publicly-owned treatment works or municipal sewers, but were endangered solely as a result of their employment activities at their private place of employment prior to any illegal discharge reaching the public sewer or works. The defendants' conduct here was utterly reprehensible and may have violated any number of other criminal laws; but it did not violate the knowing endangerment provision of the Clean Water Act.

Accordingly, the judgments of conviction are *VACATED;* judgments of acquittal shall be entered for both defendants on both counts.

---

9. The fact that this case involves pollution does not make the rule of lenity inapplicable. This is not a case like *United States v. Standard Oil Co.,* 384 U.S. 224, 225, 86 S.Ct. 1427, 1427, 16 L.Ed.2d 492 (1966), where "common sense, precedent, and legislative history" all argued for a result favorable to the Government. Likewise, the principle that "[p]ublic welfare statutes . . . are not to be construed narrowly but rather to effectuate the regulatory purpose," *United States v. MacDonald & Watson Waste Oil Co.,* 933 F.2d 35, 49–50 (1st Cir.1991), does not help the Government here, given the Clean Water Act's regulatory purpose.