# United States Court of Appeals
## For the First Circuit

No. 10-1200

CHICO SERVICE STATION, INC. and JOSÉ CHICO,

Plaintiffs, Appellants,

v.

SOL PUERTO RICO LIMITED,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. José Antonio Fusté, U.S. District Judge]

Before

Lipez, Leval,[*] and Thompson, Circuit Judges.

Orlando Cabrera-Rodríguez for appellants.
Alejandro J. Cepeda-Díaz, with whom José R. González-Irizarry, Mariana S. Pérez-Cordero, and McConnell Valdés LLC were on brief, for appellee.

January 26, 2011

---

[*] Of the Second Circuit, sitting by designation.

**LIPEZ, Circuit Judge**.  This appeal requires us to assess the propriety of Burford abstention in a citizen suit under the federal Resource Conservation and Recovery Act ("RCRA"). Appellants Chico Service Station, Inc. and José Chico brought the suit in an effort to force the cleanup of contamination caused by leaking underground storage tanks ("USTs") at a former gasoline filling station.  Their citizen suit represents the latest in a long-running series of proceedings aimed at addressing contamination at the site.  In addition to an investigatory proceeding at the Puerto Rico Environmental Quality Board ("EQB") that has been ongoing since leaks were discovered in the early 1990s, appellants have filed two lawsuits in commonwealth courts over the past decade related to the contamination of the site.

The pendency of these parallel state administrative proceedings led the district court to abstain from hearing the appellants' federal citizen suit, ordering dismissal on the authority of Burford v. Sun Oil Co., 319 U.S. 315 (1943). Application of the Burford abstention doctrine to RCRA citizen suits is an issue of first impression in this circuit. On careful consideration, we find abstention to be inappropriate, and we therefore vacate the district court's judgment.

## A. Factual Background[1]

The history of the filling station at the center of this citizen suit stretches back more than four decades. Located on a parcel of land in Río Grande, Puerto Rico, the filling station and associated USTs were in operation between the 1960s and 2001. The site, which is situated on a major road and abuts a small stream, contained five USTs: two 8,000-gallon tanks, two 5,000-gallon tanks, and a fifth tank with a capacity of 550 gallons. Until 1987, the facility was owned and operated by The Shell Company (Puerto Rico) Limited ("Shell"), predecessor to appellee Sol Puerto Rico ("Sol").[2] Shell sold the filling station in April 1987 to appellants Chico Service Station, Inc. and José Chico (collectively, "Chico").[3]

The UST leak at the filling station first came to light two years after the sale, in 1989, when an environmental consultant

_____

[1] Our recitation of facts draws from the district court's opinion as well as various documents submitted below in support of the defendant's motion to dismiss.

[2] In 2006, Sol acquired Shell in a stock purchase. The company now operates under Sol's name, though it continues to use Shell's trademarks pursuant to a license agreement.

[3] It is not entirely clear what interests were transferred in the sale. Chico represents that the purchase agreement did not include the USTs and associated pipelines, nor the station's grease trap and septic tanks, but this is neither established nor contradicted by the record. In any event, the ownership of the USTs does not bear on our decision here.

for Shell found evidence of gasoline-associated contaminants such as benzene in the soil as well as "free product" (gasoline and related petroleum constituents) floating on top of the groundwater. This discovery led Shell to conduct several environmental studies of the site over the following three years, which further confirmed the soil and groundwater contamination. Shell also installed a skimming device to aid in recovering free product from the surface of the groundwater.

In April 1993, Shell informed the EQB that free product had been found in the groundwater at the filling station.[4] The EQB added the filling station to its "Leaking Underground Storage Tank List," marking the beginning of a lengthy investigatory proceeding that continues to this date.

## B. EQB Investigation

Over the past seventeen years, there have been no formal enforcement proceedings before the EQB concerning the contamination at the filling station, nor has the EQB held any hearings, issued a final order, or approved a remediation plan for the site. The record discloses no substantive action at all by the EQB for the first eight years after it was notified of the leak. Since then, the EQB's investigation of the contaminated filling station has

---

[4] Over the course of the initial investigation, Shell's environmental consultants had twice recommended, in 1990 and 1992, that Shell disclose the suspected release to regulators; Shell apparently ignored these recommendations.

been conducted primarily by intermittent correspondence between the EQB and Shell, the highlights of which we summarize here.

In February 2001, Shell wrote to the EQB to request that the filling station be removed from the Leaking Underground Storage Tank List, in light of the fact that no free product had been detected in the groundwater for three years prior. The EQB denied the request and directed Shell to conduct additional testing. When Chico ceased active operation of the filling station in July 2001, Shell again wrote to the EQB and requested authorization to remove the idle USTs from the site. The EQB approved the removal, though the five tanks were not actually removed until March 2004 due to a dispute between Chico and Shell over access to the property.

Soil sampling results conducted in conjunction with the removal of the tanks revealed contaminant levels in excess of the applicable limits under the EQB's regulations. In response, the EQB asked Shell to prepare a site characterization plan[5] to define the plume of contamination at the site and submit a remediation plan for approval. Shell prepared a characterization plan, which the EQB approved on the condition that Shell conduct additional analysis to determine the direction of water flow at the site.

Shell's testing pursuant to the characterization plan stretched over the following several years, with results reported

---

[5] Generally speaking, a site characterization plan is a road map for gathering information about the extent and nature of contamination at a site.

to the EQB in two installments.  In January 2007, defendant Sol --
having purchased Shell in the interim -- submitted the first and
primary report, which provided details on the extent and migration
of contamination in soil and groundwater at the site.[6]  Sol
submitted a supplemental report in May 2008 disclosing the results
of additional testing, which purportedly showed a decrease in soil
contaminant levels.  Based on these results, Sol contended that no
soil remediation would be necessary, and it proposed that the
lingering groundwater contamination be addressed through aerobic
bioremediation (a technique to accelerate contaminant breakdown by
natural processes).

The submission of these results did not, however, signal
an end to the investigation.  Chico wrote the EQB in May 2008,
taking issue with, inter alia, Sol's failure to take samples in the
vicinity of the stream abutting the property and the absence of
approved guidelines for risk assessment in cases involving USTs.
The EQB apparently agreed with the latter point.  It wrote to Sol
in November 2008 and explained that the EQB was working with the
federal Environmental Protection Agency ("EPA") to develop
guidelines for evaluating UST risk assessment studies, and that
until those guidelines were finalized -- which would necessitate

---

[6] The report itself is not in the record.  Chico describes the
report as concluding that the plume of contamination appears to
have migrated outside the property limits to the north; Sol has not
disputed this characterization.

approval by both agencies and a public hearing process -- the EQB could not accept Sol's original report. The EQB also identified certain quality control issues with Sol's sampling process that required rejection of the report.

The EQB sent a follow-up letter in January 2009 calling for Sol to prepare a new characterization plan to outline additional testing. Sol met with the EQB in February to discuss the EQB's requests. In April 2009, Sol submitted to the EQB new testing plans, a compiled report summarizing the testing conducted at the filling station to date, and a proposed remediation plan. In the accompanying letter, Sol argued that a plan for additional sampling was unnecessary. There is no indication of further action taken by Sol or the EQB between April 2009 and the present.

## C. Commonwealth Legal Proceedings

In August 2003, Chico filed in a commonwealth court the first of three lawsuits relating to the filling station. Primarily a contract action, the suit sought declaratory relief and damages related to Shell's alleged breach of its site improvement obligations under a lease agreement with Chico. Among the remedies requested in the action, however, was an injunction requiring Shell to conduct an environmental site assessment, carry out any necessary remediation, and reimburse Chico for costs attributable to environmental degradation at the site. After Shell moved to dismiss, the parties settled and stipulated to dismissal of the

portion of the suit requesting injunctive relief related to the environmental condition of the site. Pursuant to the settlement agreement, Chico agreed to allow Shell access to the filling station to remove the USTs and conduct sampling activities.

Chico amended the complaint in May 2005 to allege the discovery of contamination during removal of the USTs at the filling station, and to request damages for environmental harm and operational losses stemming from the contamination. In 2010, recognizing that the question of the environmental condition of the filling station was before the EQB, the commonwealth court stayed the action pending final EQB action. The stay was subsequently upheld on interlocutory appeal to a commonwealth appeals court.

Chico filed its second action, a mandamus petition directed to the EQB, in a commonwealth court in October 2008. The petition sought an order directing the EQB to require testing for lead at the filling station, in light of evidence that Shell had sold leaded gasoline on the premises up until the 1980s.[7] Chico and the EQB quickly reached a settlement in January 2009, under which the EQB agreed to hear Chico's evidence of lead contamination, conduct the "necessary administrative hearings," and

_____

[7] Chico had sent a letter to the EQB containing an identical request in September 2008, shortly before the mandamus petition was filed, but the record discloses no response.

"issue the final resolution" in the case within sixty days.[8] In turn, Chico agreed to have its concerns heard by the EQB rather than the commonwealth courts. Pursuant to the parties' agreement, the mandamus petition was dismissed as moot.

## D. Federal Legal Proceedings

Chico filed the present suit, its third, in the United States District Court for the District of Puerto Rico in April 2009. Brought under RCRA's citizen suit provision, 42 U.S.C. § 6972, the suit rests on three core allegations. First, Chico alleges that Sol is in ongoing violation of a number of Puerto Rico's UST regulations, including those that mandate reporting of a suspected release of contaminants, require investigation and remediation following such a release, and prohibit the contamination of underground sources of drinking water. Second, Chico alleges that conditions at the filling station may present an imminent and substantial endangerment to the environment or public health actionable under RCRA. Third, Chico alleges that Sol has disposed of or abandoned gasoline, diesel, and their constituents at the filling station in violation of RCRA's solid waste disposal requirements. The suit seeks civil penalties under RCRA, in addition to an order enjoining further releases at the site and

---

[8] The record does not confirm whether any hearings were held or evidence presented within the prescribed time period, but it is clear that the EQB did not issue the "final resolution" within that time, nor has it done so to date.

requiring Sol to conduct whatever corrective or remedial actions are necessary.

In accordance with RCRA's requirements, Chico provided pre-filing notice of its intent to file a citizen suit to Sol, the EQB, the regional and national EPA administrators, and the commonwealth and federal attorneys general via letter in October 2008. See 42 U.S.C. § 6972(b). RCRA requires such notice primarily to afford regulators a chance to initiate an enforcement suit or take other formal action to address the conditions targeted by the intended citizen suit; here, no such action was taken between October 2008 and the filing of suit the next April.

Sol moved to dismiss within a month of the complaint's filing, proffering three alternative grounds for dismissal. Sol's leading argument was that RCRA's diligent prosecution bar, which precludes citizen suits where federal or state regulators are taking certain enumerated enforcement actions (see 42 U.S.C. § 6972(b)(1)(B), (b)(2)(B), (b)(2)(C)), divested the court of subject matter jurisdiction over Chico's claims. Alternatively, Sol contended that Chico's claims were moot, and separately asked the

court to abstain from hearing the suit under the <u>Burford</u>[9] and <u>Colorado River</u>[10] doctrines.

In a December 2009 opinion and order, the district court granted dismissal under <u>Burford</u>. Among several "compelling reasons to abstain" cited by the district court were Puerto Rico's interest in uniform and coherent regulation of USTs and the availability of adequate judicial review of a final administrative decision under Puerto Rico law. Chico immediately moved for reconsideration, which the court denied. This timely appeal followed.

## II.

### A. Statutory and Regulatory Background

We have previously described RCRA as "a cradle-to-grave statute providing a full range of remedies designed to protect both health and the environment." <u>United States</u> v. <u>Borowski</u>, 977 F.2d 27, 31 (1st Cir. 1992). More particularly, the Act regulates the

---

[9] As discussed in full below, the <u>Burford</u> doctrine counsels abstention in situations where a federal suit will interfere with a state administrative agency's resolution of difficult and consequential questions of state law or policy. <u>See</u> <u>New Orleans Pub. Serv., Inc.</u> v. <u>Council of New Orleans</u>, 491 U.S. 350, 361 (1989).

[10] This doctrine, derived from the Supreme Court's opinion in <u>Colorado River Water Conservation District</u> v. <u>United States</u>, 424 U.S. 800 (1976), addresses situations in which there are parallel state and federal proceedings and "'considerations of wise judicial administration' . . . counsel against duplicative lawsuits." <u>Jiménez</u> v. <u>Rodríguez-Pagán</u>, 597 F.3d 18, 27 (1st Cir. 2010) (citation omitted). Because the district court based its decision solely on the <u>Burford</u> strain of abstention and Sol has not argued for abstention under <u>Colorado River</u> in this appeal, we do not address the applicability of the <u>Colorado River</u> doctrine here.

"handling, treatment and storage of hazardous substances" and solid waste. Id. In enacting RCRA, Congress acknowledged these activities to be "primarily the function of State, regional, and local agencies," but found that, due to technological progress, increases in industrial production, and population growth, "the problems of waste disposal . . . have become a matter national in scope and in concern and necessitate Federal action." 42 U.S.C. § 6901(a)(4).

RCRA's approach to regulating solid and hazardous waste is one of cooperative federalism, of which the UST program is a paradigmatic example. Subchapter IX of RCRA creates a comprehensive federal regulatory framework for USTs, see 42 U.S.C. §§ 6991-6991m, pursuant to which the EPA has promulgated numerous specific regulations governing UST registration, leak detection, notification, and cleanup requirements. See 40 C.F.R. Pt. 280 (2010); see also Francisco Sánchez v. Esso Standard Oil Co., 572 F.3d 1, 6 (1st Cir. 2009). However, a state may, with federal approval, implement its own regulatory program for USTs. Congress expressly authorized the EPA to approve state UST regulations for operation "in lieu of the Federal program" where the state program sets requirements "no less stringent" than those established by the EPA and "provides for adequate enforcement of compliance." 42 U.S.C. § 6991c. EPA approval of a state UST program transfers primary enforcement responsibility for the program to state

regulators, id. § 6991c(d)(2), though the EPA retains parallel enforcement authority, see id. § 6991e.

Such is the case in Puerto Rico. Puerto Rico's Underground Storage Tank Control Regulations, adopted in 1990, have been approved by the EPA to operate in lieu of the federal regulations, and Puerto Rico's EQB has been delegated primary enforcement responsibility. See 40 C.F.R. § 282.102(a); Francisco Sánchez, 572 F.3d at 6-7. Puerto Rico's program appears to closely mirror the EPA's program. In fact, the provisions of Puerto Rico's regulations that Chico alleges have been violated by Sol are materially identical to the EPA's UST regulations, with a single exception.[11] Compare Puerto Rico Underground Storage Tank Control Regulations, Rules 501, 503, 601, 602, 603, 604, and 606 with 40 C.F.R. §§ 280.50, 280.52, 280.60, 280.61, 280.62, 280.63, and 280.65.

## B. Citizen Suits Under RCRA

Congress provided for broad enforcement of RCRA by federal and state regulators as well as through "citizen suits," a mechanism RCRA shares with numerous other federal environmental statutes. See 42 U.S.C. § 6972; see also, e.g., id. § 7604 (Clean Air Act); id. § 300j-8 (Safe Drinking Water Act); 33 U.S.C. § 1365

---

[11] Rule 1102(B) of Puerto Rico's Underground Storage Tank Control Regulations, setting forth a generalized prohibition on the "contamination of an existing or potential underground source of drinking water," has no direct analog in the EPA's UST regulations.

(Clean Water Act).  Citizen suits "function as a form of statutory enforcement in addition to, or in conjunction with, enforcement by an administrative agency or other governmental entity."  Esso Standard Oil Co. (P.R.) v. Rodríguez-Pérez, 455 F.3d 1, 5 n.2 (1st Cir. 2006).  As Congress noted in the course of amending RCRA to broaden its citizen suit authority, citizen suits "complement, rather than conflict with" agency enforcement of the law.  H.R. Rep. No. 98-198, pt. I, at 53 (1983), reprinted in 1984 U.S.C.C.A.N. 5576, 5612.

The present suit was brought under subsections 6972(a)(1)(A) and (a)(1)(B) of RCRA's citizen suit provision, which authorize "any person" to commence a civil action on his or her own behalf:

> (1)(A) against any person . . . who is alleged to be in violation of any permit, standard, regulation, condition, requirement, prohibition, or order which has become effective pursuant to this chapter; or
>
> (B) against any person . . . who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment[.]

42 U.S.C. § 6972(a).  The statute specifies that citizen suits under either of these subsections "shall be brought in the district court for the district in which the alleged violation occurred or the alleged endangerment may occur."  Id.  In hearing suits under

-14-

these provisions, district courts have statutory authority to grant various types of equitable relief necessary to address the violation or endangerment, as well as to impose civil penalties. Id.

Despite the broad ambit of the statute, RCRA citizen suits are subject to a handful of clearly delineated limitations. These limitations fall into two categories, both intended to avert citizen suit interference with state and federal enforcement activities. The first category requires written notice to state and federal regulators (as well as to the alleged offender) prior to filing suit, giving the responsible agencies the opportunity to address the purported violation or endangerment. See 42 U.S.C. § 6972(b)(1)(A) (requiring notice sixty days prior to filing a citizen suit based on ongoing violations of RCRA), (b)(2)(A) (requiring notice ninety days before filing a citizen suit based on an imminent endangerment). The second and related category of limitations bars suit where a responsible state or federal agency is diligently pursuing one of several enumerated judicial or administrative enforcement actions under RCRA or the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"). See 42 U.S.C. § 6972(b)(1)(B), (b)(2)(B), (b)(2)(C). This so-called "diligent prosecution bar" is invoked by appellees as an alternate ground to justify the dismissal of appellants' lawsuit.

The sole issue raised by Chico on appeal is whether the district court erred when it abstained from hearing this citizen suit on <u>Burford</u> grounds.  Chico argues that the circumstances of this case, in which the commonwealth agency responsible for UST enforcement has taken negligible action during a seventeen-year period of oversight, cannot support the district court's deference to local administrative processes.  Defendant Sol counters that abstention is proper because the "EQB is actively enforcing its UST regulations" in the investigative proceeding concerning the filling station.  Additionally, noting our authority to affirm a dismissal on any ground supported by the record, <u>see</u> <u>Román-Cancel</u> v. <u>United States</u>, 613 F.3d 37, 41 (1st Cir. 2010), Sol revives the diligent prosecution bar and mootness arguments it pressed below.  We address each in turn.

**A.  <u>Burford</u> Abstention**

1.  General Principles

Abstention occupies an uneasy position in the jurisprudence of federal court jurisdiction. As the common refrain goes, "federal courts have a 'virtually unflagging obligation . . . to exercise the jurisdiction given them.'"  <u>Ankenbrandt</u> v. <u>Richards</u>, 504 U.S. 689, 705 (1992) (quoting <u>Colo. River Water Conservation Dist.</u> v. <u>United States</u>, 424 U.S. 800, 817 (1976)); <u>United States</u> v. <u>Fairway Capital Corp.</u>, 483 F.3d 34, 44 (1st Cir.

-16-

2007) (same). This all but unyielding duty to exercise jurisdiction rests on "the undisputed constitutional principle that Congress, and not the Judiciary, defines the scope of federal jurisdiction within the constitutionally permissible bounds." New Orleans Pub. Serv., Inc. v. Council of New Orleans (NOPSI), 491 U.S. 350, 359 (1989); see also Cohens v. Virginia, 19 U.S. 264, 404 (1821) (federal courts "have no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not").

Against the backdrop of this duty to exercise jurisdiction, Supreme Court precedent has carved out a discrete set of "exceptional circumstances" in which the exercise of jurisdiction may be declined. As a general proposition, these "exceptional circumstances" lie "where denying a federal forum would clearly serve an important countervailing interest," such as "regard for federal-state relations" or "wise judicial administration." Quackenbush v. Allstate Ins. Co., 517 U.S. 706, 716 (1996) (internal quotation marks omitted). The circumstances that fit this mold are rare. Indeed, because abstention runs so firmly against the jurisprudential grain, we have repeatedly emphasized that abstention must always be "the exception, not the rule." Fragoso v. Lopez, 991 F.2d 878, 882 (1st Cir. 1993) (internal quotation marks omitted).

The particular species of abstention at issue here grew out of the Supreme Court's decision in Burford v. Sun Oil Co., 319

U.S. 315 (1943).[12]   As we have observed on past occasions, the
"fundamental concern in Burford is to prevent federal courts from
bypassing a state administrative scheme and resolving issues of
state law and policy that are committed in the first instance to
expert administrative resolution."   Pub. Serv. Co. of N.H. v.
Patch, 167 F.3d 15, 24 (1st Cir. 1998) (citing NOPSI, 491 U.S. at
361-64, and Bath Mem'l Hosp. v. Me. Health Care Fin. Comm'n, 853
F.2d 1007, 1014-15 (1st Cir. 1988)).   The Supreme Court has
articulated a two-pronged analytical framework for identifying
situations that implicate this concern:

> Where timely and adequate state-court review
> is available, a federal court sitting in
> equity must decline to interfere with the
> proceedings or orders of state administrative
> agencies: (1) when there are "difficult
> questions of state law bearing on policy
> problems of substantial public import whose
> importance transcends the result in the case
> then at bar"; or (2) where the "exercise of
> federal review of the question in a case and
> in similar cases would be disruptive of state
> efforts to establish a coherent policy with
> respect to a matter of substantial public
> concern."

NOPSI, 491 U.S. at 361 (quoting Colo. River, 424 U.S. at 814).

While Burford's principle of deference to state
administrative bodies could be interpreted expansively, requiring
that federal courts "abstain from hearing any case involving

---

[12] We provided a detailed summary of the factual background and
holding of Burford in Bath Memorial Hospital v. Maine Health Care
Finance Commission, 853 F.2d 1007, 1013-14 (1st Cir. 1988).

important state regulatory policies," Vaquería Tres Monjitas, Inc. v. Irizarry, 587 F.3d 464, 473 (1st Cir. 2009), we have declined to give it so broad a reading.  Id.  In light of the strong presumption in favor of the exercise of jurisdiction, we have held that "Burford abstention must only apply in 'unusual circumstances,' when federal review risks having the district court become the 'regulatory decision-making center.'" Id. (quoting Bath Mem'l Hosp., 853 F.2d at 1012-13); see also Fragoso, 991 F.2d at 882 (noting that, under the formulation in NOPSI, Burford abstention is limited to "narrowly circumscribed situations where deference to a state's administrative processes for the determination of complex, policy-laden, state-law issues would serve a significant local interest and would render federal-court review inappropriate").  Similarly, we have cautioned that the Burford doctrine does not require abstention merely because the federal action may impair operation of a state administrative scheme or overturn state policy.  See Patch, 167 F.3d at 24 (citing Zablocki v. Redhail, 434 U.S. 374, 379 n.5 (1978)); see also Vaquería Tres Monjitas, 587 F.3d at 473-74.

2.  Applicability of Burford

With these principles in mind, we turn to the question of Burford's application to the present suit.  We review de novo the "essentially legal determination of whether the requirements for abstention have been met," but employ a "more deferential standard"

in reviewing the district court's findings of fact and applications of law.  <u>Guillemard-Ginorio</u> v. <u>Contreras-Gómez</u>, 585 F.3d 508, 517 (1st Cir. 2009) (internal quotation marks omitted).  Though the propriety of abstention from a RCRA citizen suit is a matter of first impression in this circuit, we are far from the first court to take up the issue.  The majority of courts to have considered it have found abstention, whether under <u>Burford</u> or related doctrines such as primary jurisdiction,[13] to be improper.  See <u>DMJ Assocs., L.L.C.</u> v. <u>Capasso</u>, 228 F. Supp. 2d 223, 229 (E.D.N.Y. 2002) (citing cases).[14]

---

[13] The primary jurisdiction doctrine counsels abstention "whenever enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body." <u>United States</u> v. <u>W. Pac. R.R. Co.</u>, 352 U.S. 59, 64 (1956); <u>see</u> <u>also</u> <u>U.S. Pub. Interest Research Grp.</u> v. <u>Atl. Salmon of Me.</u>, 339 F.3d 23, 34 (1st Cir. 2003) ("[T]he primary jurisdiction doctrine permits and occasionally requires a court to stay its hand while allowing an agency to address issues within its ken.").

[14] <u>See</u>, e.g., <u>PMC, Inc.</u> v. <u>Sherwin-Williams Co.</u>, 151 F.3d 610, 619 (7th Cir. 1998) (rejecting <u>Burford</u> abstention and primary jurisdiction); <u>Interfaith Cmty. Org. Inc.</u> v. <u>PPG Indus., Inc.</u>, 702 F. Supp. 2d 295, 307-10 (D.N.J. 2010) (rejecting <u>Burford</u> and <u>Colorado River</u> abstention); <u>Remington</u> v. <u>Mathson</u>, No. CV 09-4547, 2010 WL 1233803, at *9-10 (N.D. Cal. Mar. 26, 2010) (rejecting <u>Younger</u> and <u>Colorado River</u> abstention); <u>K-7 Enters., L.P.</u> v. <u>Jester</u>, 562 F. Supp. 2d 819, 826-28 (E.D. Tex. 2007) (rejecting <u>Burford</u> abstention); <u>Coll. Park Holdings, LLC</u> v. <u>RaceTrac Petroleum, Inc.</u>, 239 F. Supp. 2d 1322, 1326-29 (N.D. Ga. 2002) (rejecting abstention under <u>Burford</u> and primary jurisdiction doctrine); <u>Me. People's Alliance</u> v. <u>Holtrachem Mfg. Co.</u>, No. 00-CV-69, 2001 WL 1704911, at *5-9 (D. Me. Jan. 8, 2001) (rejecting application of the primary jurisdiction doctrine); <u>Williams</u> v. <u>Ala. Dep't of Transp.</u>, 119 F. Supp. 2d 1249, 1257-58 (M.D. Ala. 2000) (rejecting application of the primary jurisdiction doctrine); <u>Wilson</u> v. <u>Amoco Corp.</u>, 989 F. Supp. 1159, 1170 (D. Wyo. 1998)

Before we reach the doctrinal considerations specific to Burford, we note that the careful structure of federal court jurisdiction under RCRA makes us distinctly reluctant to countenance abstention here. Abstention is, at its core, a prudential mechanism that allows federal courts to take note of and weigh significant and potentially conflicting interests that were not -- or could not have been -- foreseen by Congress at the time that it granted jurisdiction for a given class of cases to the courts. When it enacted RCRA, however, Congress recognized and addressed the specific clash of interests at issue here, by carefully delineating (via the diligent prosecution bar) the situations in which a state or federal agency's enforcement efforts will foreclose review of a citizen suit in federal court.[15] To abstain in situations other than those identified in the statute thus threatens an "end run around RCRA," PMC, Inc. v. Sherwin-Williams Co., 151 F.3d 610, 619 (7th Cir. 1998), and would

_____

(same); White & Brewer Trucking, Inc. v. Donley, 952 F. Supp. 1306, 1311-14 (C.D. Ill. 1997) (rejecting Burford abstention); Craig Lyle Ltd. P'ship v. Land O'Lakes, Inc., 877 F. Supp. 476, 483-84 (D. Minn. 1995) (rejecting abstention under Burford and the primary jurisdiction doctrine). But see Coal. for Health Concern v. LWD, Inc., 60 F.3d 1188, 1193-95 (6th Cir. 1995) (applying Burford abstention to RCRA citizen suit); Friends of Santa Fe Cnty. v. LAC Minerals, Inc., 892 F. Supp. 1333, 1347-49 (D.N.M. 1995) (same).

[15] As discussed below, the statutory bar to citizen suits applies only where a regulatory agency has filed a formal action in state or federal court or is pursuing one of a handful of remedial actions under CERCLA. See 42 U.S.C. § 6972(b)(1)(B), (b)(2)(B), (b)(2)(C).

substitute our judgment for that of Congress about the correct balance between respect for state administrative processes and the need for consistent and timely enforcement of RCRA. Cf. Charlotte Gibson, Note, Citizen Suits Under the Resource Conservation & Recovery Act: Plotting Abstention on a Map of Federalism, 98 Mich. L. Rev. 269, 281 (1999) (arguing that federal courts "may not create a separate standard as to what level of administrative investigation is sufficient to dismiss a citizen suit").

Moreover, we are leery of abstaining where litigants may be unable to press their federal claims in a state forum. Section 6972(a) -- which states both that citizen suits "shall be brought in the district court for the district in which the alleged violation occurred or the alleged endangerment may occur" and that "[t]he district court shall have jurisdiction" to grant relief in such suits -- arguably locates exclusive jurisdiction over RCRA citizen suits in the federal courts. The majority of courts that have examined the issue have reached that conclusion. See Blue Legs v. U.S. Bureau of Indian Affairs, 867 F.2d 1094, 1098 (8th Cir. 1989) (stating that federal courts have exclusive jurisdiction over RCRA citizen suits); Interfaith Cmty. Org. Inc. v. PPG Indus., Inc., 702 F. Supp. 2d 295, 307 (D.N.J. 2010) (same); Remington v. Mathson, No. CV 09-4547, 2010 WL 1233803, at *8-9 (N.D. Cal. Mar. 26, 2010) (same); K-7 Enters., L.P. v. Jester, 562 F. Supp. 2d 819, 827 (E.D. Tex. 2007) (same); White & Brewer

Trucking, Inc. v. Donley, 952 F. Supp. 1306, 1312 (C.D. Ill. 1997) (same). But see Davis v. Sun Oil Co., 148 F.3d 606, 611-12 (6th Cir. 1998) (holding that federal courts do not have exclusive jurisdiction over RCRA citizen suits).

Regardless of whether the jurisdiction conferred by Congress is exclusive, the statute plainly reflects an emphasis by Congress on the availability of a federal forum for consistent and timely review of RCRA claims. Taken together with Congress's careful delineation of the limited situations in which federal courts must refrain from hearing citizen suits, it counsels federal courts to exercise great caution in considering abstention. While we are not prepared to rule out categorically the possibility of abstention in a RCRA citizen suit, we believe that the circumstances justifying abstention will be exceedingly rare. As we explain, the case before us offers no such justification for second-guessing the balance struck by Congress.

In finding abstention to be improper here, we consider three factors: (1) the availability of timely and adequate state-court review, (2) the potential that federal court jurisdiction over the suit will interfere with state administrative policymaking, and (3) whether conflict with state proceedings can be avoided by careful management of the federal case.

i.    Availability of State-Court Review

Under the modern formulation of the Burford doctrine, a court weighing abstention must first determine whether "timely and adequate state-court review is available." NOPSI, 491 U.S. at 361. In making this assessment here, the district court found that "the record abounds with evidence of adequate judicial review," citing the two lawsuits filed by Chico in the commonwealth courts as well as the availability under Puerto Rico law of judicial review for final agency decisions. See P.R. Laws Ann. tit. 3, §§ 2171-77. As a formal matter, the district court is correct that Puerto Rico law provides for review of administrative decisions, and the record provides no basis to doubt the adequacy of that review.

We have significant concerns, however, about the timeliness of the review offered by commonwealth courts in the present case. The availability of judicial review for "final orders" by commonwealth agencies, id. § 2171, can hardly qualify as "timely and adequate" if, as here, the agency may take decades to issue a reviewable final order. Perhaps Chico could seek mandamus relief in a commonwealth court to force more prompt action by the EQB. Because Chico dismissed its mandamus petition upon settling with the EQB, though, the record does not reflect whether mandamus relief is available and effective, nor was the issue briefed by the parties. The experience of Chico's other commonwealth lawsuit, which was stayed in deference to the EQB, gives us little comfort

-24-

that Chico could in fact obtain "timely and adequate" review of the EQB's actions in the commonwealth courts.[16]

### ii. Interference with State Policymaking

Even if we were to find adequate review available in the commonwealth courts, we nonetheless would consider this case to be an improper candidate for Burford abstention. As we have said, the animating concern under Burford is the threat that federal courts will usurp the role of state administrative agencies in deciding "issues of state law and policy that are committed in the first instance to expert administrative resolution." Patch, 167 F.3d at 24. In light of the intertwined state and federal interests implicated by RCRA, that concern does not obtain here.

The Supreme Court's articulation of the Burford doctrine in NOPSI provides a convenient analytical framework for evaluating this interplay of interests. Accordingly, we first examine whether "there are 'difficult questions of state law bearing on policy problems of substantial public import whose importance transcends

---

[16] In fairness, we note that the history of the stay is not entirely clear. Sol initially moved for and obtained a stay of the commonwealth court action pending completion of the EQB proceedings. However, that stay was set aside upon a motion for reconsideration filed by Chico. Some time later, Chico filed an "information motion" (the content of which is not disclosed by the record), which prompted the commonwealth court to reinstate the stay, apparently sua sponte. For reasons that cannot be divined from the record, Sol then moved for reconsideration of the reinstated stay. The court denied Sol's motion for reconsideration, and a commonwealth appeals court affirmed the stay on appeal.

the result in the case . . . at bar.'" NOPSI, 491 U.S. at 361 (quoting Colo. River, 424 U.S. at 814).

The substantive laws at issue in Chico's citizen suit are indeed commonwealth regulations, but they rest heavily on a framework of federal law. To a large extent, RCRA dictates the content and standards of Puerto Rico's UST program, leaving the Commonwealth only the discretion to enact regulations that are no less stringent than those developed by the EPA. See 42 U.S.C. § 6991c. The questions of law at issue in this suit are therefore only marginally questions of commonwealth law, with a strong federal cast. Moreover, they are of no particular difficulty. Federal courts regularly interpret EPA regulations substantively identical to those here,[17] see, e.g., Albany Bank & Trust Co. v. Exxon Mobil Corp., 310 F.3d 969, 974 (7th Cir. 2002), and have an affirmative interest in ensuring that corresponding state regulations are interpreted in a consistent manner.

Nor are we concerned, turning to the second category of cases identified by NOPSI to warrant abstention, that the exercise of federal review of the enforcement of state regulations in this case or similar cases "'would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern.'" NOPSI, 491 U.S. at 361 (quoting Colo. River, 424

_____

[17] As we previously noted, all but one of the Puerto Rico UST regulations cited in Chico's complaint are substantively identical to EPA regulations.

-26-

U.S. at 814). In enacting RCRA, Congress made an express determination that a coherent <u>national</u> policy was necessary to address the serious, jurisdiction-spanning problems of solid and hazardous waste, thereby inherently privileging the consistency of federal regulation over local control. <u>See</u> 42 U.S.C. § 6901(a)(4). By design, RCRA interferes with a state's efforts to establish its own policy with respect to hazardous waste, both in subjecting state regulations to federal review and in mandating that they adhere to a federal framework. It would fly in the face of Congress's unmistakable attention to the coherency of national policy for a federal court to defer to a local agency. As one of our sister circuits has observed in similar circumstances, such ill-advised deference "might well result in review by fifty different state agencies with fifty different charters," which would all but "ensure non-uniformity" in interpretation and enforcement. <u>Cnty. of Suffolk</u> v. <u>Long Island Lighting Co.</u>, 907 F.2d 1295, 1310 (2d Cir. 1990).

iii. Likelihood of Conflict with State Proceeding

There is one additional reason why abstention is inappropriate in this case. As we have cautioned before, a federal court may abstain only where conflict with state administrative processes cannot be avoided through careful conduct of the federal case:

> The abstention issue posed here is whether the litigation necessarily implies an involvement

-27-

> in the administration of the internal affairs of the [state regulatory body] so unseemly for a federal court as to encroach on principles of comity and federalism. As we see the issue, the word "necessarily" is of critical importance. . . . This means to us that a federal judge, while being . . . sensitive to important state interests and . . . wary of intruding in internal state affairs . . ., will also endeavor to see if the legitimate objectives of the litigation can be pursued without treading on those state interests and internal affairs. If they cannot be so pursued, abstention should be invoked; but if the case can so be managed that fears of unseemly intrusion can be dispelled, abstention should be refused.

Planned Parenthood League of Mass. v. Bellotti, 868 F.2d 459, 464 (1st Cir. 1989).

Intrusion on state affairs is by no means inevitable here. This is not a case where review is, in effect, sought for a final state administrative decision in federal rather than state court, "effectively creat[ing] a dual review structure for adjudicating a state's specific regulatory actions." Vaquería Tres Monjitas, 587 F.3d at 474; see also Sugarloaf Citizens Ass'n v. Montgomery Cnty, Md., 33 F.3d 52 (4th Cir. 1994) (unpublished table decision) (applying Burford abstention to RCRA citizen suit where it was "merely . . . a collateral attack" on state agency's permitting decisions).

Instead, Chico's suit seeks an order enjoining further releases of contaminants at the filling station and requiring defendant Sol to take remedial action, as well as the imposition of

civil penalties. None of these steps requires that the court directly review actions taken by the Puerto Rico EQB, which, in any event, has issued no final order. Indeed, the fact that the EQB has taken so little action over the past seventeen years suggests that conflict with the EQB's proceedings is unlikely. We might be more concerned if we were faced with an aggressive and comprehensive state enforcement proceeding on the verge of a final order, but that simply is not the case here. Regardless, should the threat of conflict arise, we see no reason why federal court relief could not be structured so as to avoid interference with the EQB proceeding. See Coll. Park Holdings, LLC v. RaceTrac Petroleum, Inc., 239 F. Supp. 2d 1322, 1328 (N.D. Ga. 2002) (noting that documentation of agency's "institutional attitudes and remediation expectations" produced in the course of an administrative proceeding would permit the federal court "to fashion appropriate non-conflicting relief"); cf. Francisco Sánchez, 572 F.3d at 13 (concluding that threat of duplicative or conflicting remedies in parallel RCRA enforcement suits could not justify "short circuit[ing]" the federal suit on jurisdictional grounds at an early stage).

## B. Diligent Prosecution Bar

We next examine whether the investigative proceeding of the Puerto Rico EQB falls within the discrete, statutorily

-29-

enumerated list of enforcement actions that will bar a citizen suit under RCRA. We conclude that it does not.

There are three basic circumstances in which state action will bar a RCRA citizen suit: (1) where the state "has commenced and is diligently prosecuting" an enforcement action; (2) where the state is engaged in a removal action under CERCLA that addresses an imminent endangerment alleged by the citizen suit; and (3) where the state has incurred costs to initiate a Remedial Investigation and Feasibility Study under CERCLA and is diligently proceeding with a remedial action that addresses the alleged imminent endangerment. 42 U.S.C. § 6972(b)(1)(B), (b)(2)(C). The first of these bars applies equally to RCRA suits brought under the "ongoing violations" prong of RCRA's citizen suit provision, § 6972(a)(1)(A), and suits based on the "imminent endangerment" prong, § 6972(a)(1)(B). The latter two bars apply solely to imminent endangerment suits. Here, Chico filed suit under both prongs, and thus we consider the application of all three bars.

The latter two we can discount out of hand, as the EQB has taken no action under CERCLA. The only colorable issue is whether the EQB, through its investigative proceedings, "has commenced and is diligently prosecuting" an enforcement action that addresses the substance of Chico's citizen suit claims. Id. § 6972(b)(1)(B), (b)(2)(C)(i). Most courts that have examined this aspect of the diligent prosecution bar have concluded that the

language of the statute requires a formal action in court.[18]  We agree.

Though the statute uses different language to describe the bar as it applies to "ongoing violation" suits versus "imminent endangerment" suits, both plainly necessitate an action in court. For ongoing violation citizen suits, the statute is explicit: such suits will be barred only where the "State has commenced and is diligently prosecuting a civil or criminal action <u>in a court</u> of the United States or a State to require compliance with such permit, standard, regulation, condition, requirement, prohibition, or order."  <u>Id.</u> § 6972(b)(1)(B) (emphasis added).  In the case of imminent endangerment suits, the statute is less direct, providing that suit will be barred where the state "has commenced and is diligently prosecuting an action under subsection (a)(1)(B) of this section" (i.e., the imminent endangerment provision of RCRA's citizen suit statute).  <u>Id.</u> § 6972(b)(2)(C)(i).  While there is no express reference in this latter provision to an action "in a court," such limitation is implicit.  Section 6972 provides that "any person may commence <u>a civil action</u>" to address circumstances which may present an imminent endangerment, and states that any

---

[18] <u>See</u>, <u>e.g.</u>, <u>Marrero Hernandez</u> v. <u>Esso Standard Oil Co.</u>, 597 F. Supp. 2d 272, 280 (D.P.R. 2009); <u>Kara Holding Corp.</u> v. <u>Getty Petroleum Mktg., Inc.</u>, 67 F. Supp. 2d 302, 306-07 (S.D.N.Y. 1999); <u>Gilroy Canning Co.</u> v. <u>Cal. Canners & Growers</u>, 15 F. Supp. 2d 943, 946-47 (N.D. Cal. 1998); <u>see</u> <u>also</u> Gibson, <u>supra</u>, at 276 ("Courts have unanimously understood [RCRA's] statutory bar to require court action, not simply administrative inquiry.").

such action "shall be brought in the district court for the district in which . . . the alleged endangerment may occur." Id. § 6972(a) (emphasis added). Thus, this provision also refers to a formal action in court.

Because the EQB has not filed an enforcement action in state or federal court, we hold that Chico's citizen suit is not subject to dismissal pursuant to the diligent prosecution bar.

## C. Mootness

We last address defendant Sol's argument that the district court's dismissal of Chico's citizen suit may be upheld on mootness grounds. "Article III of the Constitution restricts federal courts to the resolution of actual cases and controversies." Overseas Military Sales Corp. v. Giralt-Armada, 503 F.3d 12, 16 (1st Cir. 2007) (citing U.S. Const. art. III, § 2, cl. 1). In so limiting the jurisdiction of the federal courts, Article III "ensures that courts do not render advisory opinions." Id. at 17. "When a case is moot -- that is, when the issues presented are no longer live or when the parties lack a legally cognizable interest in the outcome -- a case or controversy ceases to exist, and dismissal of the action is compulsory." Cruz v. Farquharson, 252 F.3d 530, 533 (1st Cir. 2001) (citations omitted). Sol's mootness argument rests on two subsidiary contentions: first, that Sol has complied with each of the UST regulations that Chico seeks to enforce under § 6972(a)(1)(A), and second, that "there is

no further remedy that the Court could issue to address Chico's claims."

### 1. Sol's Compliance with Applicable UST Regulations

On the record before us, we cannot conclude that Chico's claim under § 6972(a)(1)(A) is moot on the ground that Sol has complied with the UST regulations Chico seeks to enforce. At a minimum, there appear to be unresolved disputes as to whether Sol has met its initial abatement obligations under Rule 603 of Puerto Rico's UST regulations; whether Sol has adequately investigated the "full extent and location of soils contaminated by the release and the presence and concentrations of dissolved product contamination in the groundwater" under Rule 606; and whether Sol is in violation of Rule 1102, which proscribes the "contamination of an existing or potential underground source of drinking water." We thus are unable to say that there is no live controversy to be decided with respect to Chico's claim under § 6972(a)(1)(A).[19]

### 2. Availability of Further Relief

There is no question that an action becomes moot when the court "cannot grant 'any effectual relief whatever'" in favor of the plaintiff. Calderon v. Moore, 518 U.S. 149, 150 (1996)

---

[19] Because the district court never reached the mootness arguments that Sol advances here, the record is thin and our assessment is not conclusive. The district court may wish to more fully explore the question of mootness on remand. See Calderon v. Moore, 518 U.S. 149, 150 (1996) ("[M]ootness can arise at any stage of litigation.").

(quoting Mills v. Green, 159 U.S. 651, 653 (1895)).  To avoid mootness, though, the plaintiff need not establish that the full relief sought is available; "even the availability of a 'partial remedy' is 'sufficient to prevent [a] case from being moot.'"  Id. (quoting Church of Scientology of Cal. v. United States, 506 U.S. 9, 13 (1992)) (alteration in original); see also Weaver's Cove Energy, LLC v. R.I. Coastal Res. Mgmt. Council, 589 F.3d 458, 468 (1st Cir. 2009) ("We will only find a case moot if an intervening event 'makes it impossible for the court to grant any effectual relief.'" (quoting Gulf of Me. Fisherman's Alliance v. Daley, 292 F.3d 84, 88 (1st Cir. 2002))).

It is undisputed that some -- or all -- of the relief requested by Chico remains outstanding and could be granted by a federal court.  Most significantly, no order requiring remediation of the filling station site has been issued by any commonwealth or federal tribunal.  Nonetheless, Sol argues that, because the EQB has a proposed remediation plan before it as well as the power to grant the civil penalties Chico has requested, any relief the district court could order would be duplicative and unnecessary. This is nothing more than a repackaged version of the meritless abstention argument.  The fact that the EQB proceeding might eventually yield an order providing the same relief sought in the district court action in no way renders the plaintiffs' suit moot. See ConnectU LLC v. Zuckerberg, 522 F.3d 82, 89 (1st Cir. 2008)

-34-

(holding that the pendency of parallel actions seeking same relief does not render either action moot).

## IV.

The circumstances that can sustain a federal court's abstention from the duty to exercise jurisdiction are rare. This is particularly true for citizen suits brought under RCRA. In light of the important federal interests at stake and the care with which Congress delineated the situations in which RCRA citizen suits will be barred, only exceptional circumstances could justify abstention. Because such circumstances are not present here, the district court erred in abstaining. Moreover, we conclude that neither the diligent prosecution bar nor mootness can independently support the district court's dismissal of Chico's suit. We must therefore vacate the judgment of the district court. Costs shall be awarded to the appellants.

**So ordered.**