# United States Court of Appeals
## For the First Circuit

No. 20-1784

FORTY SIX HUNDRED LLC,

Plaintiff, Appellee,

v.

CADENCE EDUCATION, LLC, d/b/a NEXT GENERATION CHILDREN'S
CENTERS,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Timothy S. Hillman, U.S. District Judge]

Before

Thompson, Selya, and Hawkins,[*]
Circuit Judges.

Paul B. Lewis, with whom Bruce E. Falby and DLA Piper LLP
were on brief, for appellant.
Douglas T. Radigan, with whom Jared A. Fiore and Bowditch &
Dewey LLP were on brief, for appellee.

September 30, 2021

---

[*] Of the Ninth Circuit, sitting by designation.

**SELYA**, **Circuit Judge**.  This appeal, which rises like the mythical phoenix from the ashes of an eviction action removed from a Massachusetts state court, poses a series of gnarly questions related to the propriety of the district court's abstention-based remand order and the premature return of the underlying action to the state court.  After sifting through the parties' arguments, we conclude that the district court erred in ordering the remand.  We further conclude that the court's premature return of the case to the state court does not constrain our ability to remedy this error.  Accordingly, we reverse the remand order and direct the district court to retrieve the removed action and resume jurisdiction over it.  We also offer some guidance to district courts generally, aimed at avoiding the unnecessary shuttling of removed cases back and forth between state and federal courts.

**I**

We start by rehearsing the relevant facts and travel of the case.  In 1997, defendant-appellant Cadence Education, LLC (Cadence) and plaintiff-appellee Forty Six Hundred LLC (FSH) executed a lease through which Cadence, as lessee, rented a property in Westborough, Massachusetts from FSH, as lessor.  The lease arrangement was uneventful for more than two decades.  The relationship soured, though, when (according to FSH) Cadence failed to pay the rent due for the months of April, May, and June 2020.

On June 10, 2020, FSH served Cadence with a pleading styled as a "Summary Process (Eviction) Summons and Complaint." The original complaint was filed in a Massachusetts state court (the Westborough District Court), where it would have been governed by the Massachusetts Trial Court Uniform Summary Process Rules (the Uniform Rules) and the provisions of chapter 239 of the Massachusetts General Laws. The action sought both to evict Cadence for nonpayment of rent and to recover $83,553.90 in damages (for rent arrearages).

On July 9, Cadence seasonably removed the action to the federal district court, alleging the existence of diversity jurisdiction.[1] See 28 U.S.C. §§ 1332, 1441(b). FSH countered by moving to remand the action to the state court. In its motion papers, FSH did not dispute that the action satisfied the statutory imperatives for federal diversity jurisdiction but, rather, argued (as pertinent here) that the federal district court was entitled to abstain from adjudicating the action under Burford abstention principles. See Burford v. Sun Oil Co., 319 U.S. 315, 334 (1943). Cadence opposed this motion.

---

[1] Cadence is a Delaware limited liability company, and FSH is a Massachusetts limited liability company. Cadence has represented that there is no overlap between the state(s) of which its members are citizens and the state(s) of which FSH's members are citizens, and FSH has not challenged this representation. Money damages are sought, and the amount in controversy exceeds $75,000.

On August 10, 2020, the district court granted FSH's motion to remand. See Forty Six Hundred LLC v. Cadence Educ., LLC, 478 F. Supp. 3d 84, 87 (D. Mass. 2020). Although the court acknowledged that federal courts may have original jurisdiction over removed summary eviction proceedings, it concluded that "this is the rare ca[s]e where abstention is appropriate." Id. at 86. In order "to preserve the state statutory scheme" — a reference to the applicable Massachusetts rules of summary process for eviction cases — the court declined to exercise jurisdiction over the action. Id. at 87.

On the same day that the district court entered its remand order, Cadence appealed that order. See Quackenbush v. Allstate Ins. Co., 517 U.S. 706, 715 (1996) (holding that an abstention-based remand order is appealable under 28 U.S.C. § 1291). Cadence also asked the district court to stay its remand order. The district court denied Cadence's motion to stay without explanation and proceeded immediately to execute the remand, returning the action to the state court.[2] The action remains pending in the state-court system.

---

[2] Once the district court denied its stay motion, Cadence filed an emergency motion in this court to stay the remand order pending appeal. After it learned that the district court had remitted the action to the state court, however, it voluntarily withdrew its motion because there was nothing left for this court to stay.

- 4 -

To begin, Cadence takes aim at the district court's decision to refrain from exercising jurisdiction over the action. Its challenge rests primarily on the contention that the Burford abstention doctrine is inapplicable here. Thus, Cadence says, the district court's allowance of FSH's motion to remand must be reversed.

Before grappling with Cadence's argument, we pause to note an oddity. Although both parties have proceeded in this court on the understanding that the Burford abstention doctrine lies at the heart of the matter, the district court never explicitly mentioned Burford. It falls to us, then, to determine at the outset whether the district court's decision to abstain was actually grounded on Burford principles.

A close review of the proceedings below, including the district court's stated reasoning, reveals that the court did indulge in Burford abstention. For one thing, the Burford doctrine was the only basis for abstention put forward by FSH. For another thing, the district court — in choosing to abstain — relied on the decision in Glen 6 Associates, Inc. v. Dedaj, 770 F. Supp. 225, 229 (S.D.N.Y. 1991). That court, in turn, supported its abstention decision by citation to case law applying the Burford abstention doctrine. See id. at 228. This case law included, for example, Alabama Public Service Commission v. Southern Railway Co., 341

U.S. 341, 345 (1951) (explaining that question sub judice is one "framed by the Court in Burford"), and Tonwal Realties, Inc. v. Beame, 406 F. Supp. 363, 364 (S.D.N.Y. 1976) (relying on Burford as basis for abstention). See Glen 6 Assocs., Inc., 770 F. Supp. at 228. To cinch the matter, the district court's stated concern about potential interference with a "comprehensive [state] legislative scheme," Forty Six Hundred, 478 F. Supp. at 87, tracks the language we have used to articulate the purpose of the Burford abstention doctrine, see Sevigny v. Emps. Ins. of Wausau, 411 F.3d 24, 28 (1st Cir. 2005) (noting that "Burford['s] central concern [is] protecting state-agency schemes"). Given these telltale signs, the only plausible reading of the district court's rescript is that it abstained on the basis of the Burford abstention doctrine.

Having dispelled any uncertainty about the doctrinal underpinnings of the district court's abstention-based remand order, we turn to the supportability of that order. A district court's decision to abstain has two elements. The court first must determine whether certain preconditions for abstention are met and, if so, must then determine whether abstention is appropriate. See DeMauro v. DeMauro, 115 F.3d 94, 99 (1st Cir. 1997). We review de novo the district court's threshold determination as to "whether the requirements for [Burford] abstention have been met." Chico Serv. Station, Inc. v. Sol P.R.

- 6 -

Ltd., 633 F.3d 20, 30 (1st Cir. 2011) (quoting Guillemard-Ginorio v. Contreras-Gómez, 585 F.3d 508, 516 (1st Cir. 2009)). If the decision passes through that screen, we then review the court's bottom-line decision to abstain for abuse of discretion. See id.; Vaquería Tres Monjitas, Inc. v. Irizarry, 587 F.3d 464, 474 (1st Cir. 2009); Sevigny, 411 F.3d at 26-27.

Cadence argues that Burford abstention is inapposite here. We tee up its arguments by tracing the legal contours of the Burford abstention doctrine. The baseline rule, of course, is that "federal courts have a strict duty to exercise the jurisdiction that is conferred upon them by Congress." Quackenbush, 517 U.S. at 716; see Colo. River Water Conservation Dist. v. United States, 424 U.S. 800, 817 (1976) (noting the "virtually unflagging obligation of the federal courts to exercise the jurisdiction given them"); Chico Serv. Station, 633 F.3d at 29 (explaining that the "all but unyielding duty to exercise jurisdiction rests on 'the undisputed constitutional principle that Congress, and not the Judiciary, defines the scope of federal jurisdiction within the constitutionally permissible bounds'" (quoting New Orleans Pub. Serv., Inc. v. Council of New Orleans (NOPSI), 491 U.S. 350, 359 (1989))).

Though strict, this duty is not absolute. See Quackenbush, 517 U.S. at 716. The Supreme Court has carved out certain "exceptional circumstances" — circumstances in which

- 7 -

"denying a federal forum would clearly serve an important countervailing interest" — that may warrant a federal court's eschewal of jurisdiction. Id. (first quoting Colo. River Water Conservation Dist., 424 U.S. at 813). Even so, "[t]he circumstances that fit this mold are rare." Chico Serv. Station, 633 F.3d at 29. And "because abstention runs so firmly against the jurisprudential grain," we treat abstention as "the exception, not the rule." Id. (quoting Fragoso v. Lopez, 991 F.2d 878, 882 (1st Cir. 1993)).

The Burford Court identified one such exception to a federal court's duty to exercise jurisdiction. See 319 U.S. at 334. There, the plaintiff asked a federal court to invalidate, under state law, an order issued by the Texas Railroad Commission (the Commission), which had granted the defendant a permit to drill for oil in a field where hundreds of other producers also had wells. See id. at 316-17, 319. At the time, the power to decide who could extract what oil from a commonly drilled field rested with the Commission. See id. at 320. The Commission's judgments entailed consideration of a multitude of factors, including the oil supply, market demand, protection of the individual operators and the public interest, spacing of the wells, as well as highly technical geologic data. See id. at 321-22. To achieve consistency in judgments, to avoid "interminable confusion," id. at 326 (quoting Tex. Steel Co. v. Fort Worth & Denver City Ry.

Co., 40 S.W.2d 78, 82 (Tex. 1931)), and to develop "specialized knowledge . . . useful in shaping the policy of regulation of the ever-changing demands in this field," a state statute centralized direct judicial review in the state district courts of a particular Texas county, id. at 326-27. Because the intervention of the lower federal courts "threatened to frustrate the purpose of the complex administrative system that Texas had established," the Supreme Court deemed abstention proper. Quackenbush, 517 U.S. at 725 (discussing Burford).

The Court later emphasized that Burford permits a federal court to abstain "only in extraordinary circumstances." Id. at 726. "Burford allows a federal court to dismiss a case only if it presents difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar, or if its adjudication in a federal forum would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern." Id. at 726-27 (internal quotations omitted).

Mindful of these admonitions, we have read Burford and its progeny narrowly. We have said that "abstention in the Burford line of cases rested upon . . . the threat . . . that the federal court might, in the context of the state regulatory scheme, create a parallel, additional, federal, 'regulatory review' mechanism,

- 9 -

the existence of which would significantly increase the difficulty of administering the state regulatory scheme." Bath Mem'l Hosp. v. Maine Health Care Fin. Comm'n, 853 F.2d 1007, 1013 (1st Cir. 1988); see Pub. Serv. Co. of N.H. v. Patch, 167 F.3d 15, 24 (1st Cir. 1998) ("The fundamental concern in Burford is to prevent federal courts from bypassing a state administrative scheme and resolving issues of state law and policy that are committed in the first instance to expert administrative resolution."). That a case implicates "important state regulatory policies," Chico Serv. Station, 633 F.3d at 30 (quoting Vaquería Tres Monjitas, 587 F.3d at 473), or that "federal action may impair operation of a state administrative scheme or overturn state policy" does not alone justify Burford abstention, id.; see NOPSI, 491 U.S. at 362 (explaining that "[w]hile Burford is concerned with protecting complex state administrative processes from undue federal interference, it does not require abstention whenever there exists such a process, or even in all cases where there is a 'potential for conflict' with state regulatory law or policy" (quoting Colo. River Water Conservation Dist., 424 U.S. at 816)). Instead, Burford abstention applies only in "unusual circumstances," where the federal court risks usurping the state's role as the "regulatory decision-making center." Vaquería Tres Monjitas, 587 F.3d at 474 (quoting Bath Mem'l Hosp., 853 F.2d at 1012-13); see Fragoso, 991 F.2d at 882 (noting that Burford abstention is limited

to "narrowly circumscribed situations where deference to a state's administrative processes for the determination of complex, policy-laden, state-law issues would serve a significant local interest and would render federal-court review inappropriate").

It is against this backdrop that we measure the fit between Burford and the case at hand. Cadence asserts that the Uniform Rules and Massachusetts General Laws chapter 239 do not constitute the kind of complex state administrative scheme that engenders protection under Burford. See NOPSI, 491 U.S. at 362 (explaining Burford's concern with protection of "complex state administrative processes"); Patch, 167 F.3d at 24 (expressing similar view with respect to "state administrative scheme[s]"); Cnty. of Suffolk v. Long Island Lighting Co., 907 F.2d 1295, 1309 (2d Cir. 1990) (explaining that "intricate state administrative scheme" is the "sine qua non" of Burford abstention). In arguing against this assertion, FSH unwittingly makes Cadence's case. We explain briefly.

The rules and statutes that FSH identifies are merely rules of procedure designed to expedite summary process eviction proceedings. See Uniform Rule 1 ("These rules govern procedure in all summary process actions in the Trial Court of the Commonwealth."); see also FDIC v. Sweeney, 136 F.3d 216, 219 (1st Cir. 1998) (describing Massachusetts summary process rules as "abbreviated procedures"). As FSH points out, the Uniform Rules

- 11 -

specify such things as the physical form that must be used to initiate a summary process action, see Uniform Rule 2(a); the timing of service of process, see Uniform Rule 2(b) (mandating service of summons and complaint "no later than the seventh day nor earlier than the thirtieth day before the entry day," subject to certain conditions); entry dates, see Uniform Rule 2(c) (requiring entry dates to be "each Monday"); and the format and content of a defendant's answer, see Uniform Rule 3 (requiring that defendant "prepare a written answer containing . . . the caption 'Summary Process Answer' with the trial date set forth below the caption[,] . . . deny[ing] every statement in the complaint which is in dispute[,] . . . [and] stating . . . any affirmative defense").  These rules also confirm the applicability of some state procedural imperatives, which apply both to the Massachusetts summary process scheme and outside that scheme.  See, e.g., Uniform Rule 8 (applying Mass. R. Civ. P. 38); Uniform Rule 13 (applying relevant parts of Mass. R. Civ. P. 60, 62).  Even the court below acknowledged that these summary process rules were, for the most part, comparable to those applicable in plenary civil litigation.  See Forty Six Hundred, 478 F. Supp. 3d at 86.  Simply put, the Uniform Rules, with their statutory gloss, are no more than stereotypical rules of procedure, including directives about when to file and what to title a filing.  They do not amount to "the sort of complex administrative scheme at issue in Burford."

Sweeney, 136 F.3d at 219. It follows that, in this instance, there is no plausible threat of "disrupt[ing] state efforts to establish coherent policy with respect to a matter of substantial public concern." NOPSI, 491 U.S. at 361 (quoting Colo. River Water Conservation Dist., 424 U.S. at 814). Substitution of procedural rules, which do not themselves amount to a complex administrative scheme, prevents neither the development of substantive state policies nor application of those policies by a federal court.

FSH's argument to the contrary rests heavily on the notion that the summary process rules are "complex." But for that proposition, FSH relies on the decision in Adjartey v. Central Division of Housing Court Department, 120 N.E.3d 297 (Mass. 2019). This reliance is misplaced. Although the Massachusetts Supreme Judicial Court (the SJC) did use the adjective "complex" in describing the summary process scheme, id. at 304, Adjartey hardly can be said to support federal abstention. There, the SJC described summary process cases as "complex," particularly for pro se tenants confronted by "landlords who are represented by attorneys." Id. at 304, 306. The SJC did not deem the procedure "complex" as compared to the wide universe of state administrative schemes. Moreover, it is apparent to us that the summary process rules and the scheme that they elaborate are straightforward, and Adjartey does not undercut this assessment.

In a variation on the same theme, FSH contends that the summary process rules constitute a "specialized procedure," which would be "unavailable in the federal court." This contention proves too much: all removed actions are subject to the Federal Rules of Civil Procedure. See Fed. R. Civ. P. 81(c)(1); Rinsky v. Cushman & Wakefield, Inc., 918 F.3d 8, 17 (1st Cir.), cert. denied, 140 S. Ct. 455 (2019). Those rules invariably displace the procedural rules that would have governed the removed action had that action remained in the state-court system. We do not think that this rule-displacement mechanism is capable of transmogrifying previously applicable state procedural rules into state administrative schemes worthy of Burford protection. Any other conclusion would make the act of removal alone sufficient to trigger abstention — a result wholly inconsistent with the Supreme Court's cabining of Burford abstention to "extraordinary circumstances." Quackenbush, 517 U.S. at 726.

What is more, the substance of summary process cases independently shows that there is no threat of interference with state policymaking sufficient to warrant Burford abstention. The Burford doctrine guards against federal interference with a state's resolution of "difficult and consequential questions of state law or policy." Chico Serv. Station, 633 F.3d at 26 n.9 (citing NOPSI, 491 U.S. at 361); see Sweeney, 136 F.3d at 219 (requiring "difficult, complex questions of state law"); Fragoso,

- 14 -

991 F.2d at 883 (declining to abstain when appeal "frame[d] no difficult question of state law bearing on significant public policy issues" (quotations omitted)). The adjudication of an eviction action does not involve the kinds of difficult and unsettled questions of state substantive law that can suffice to trigger abstention.

As we explained nearly two decades ago, "there [is] nothing unusual about the federal court . . . appl[ying] Massachusetts law regulating the possession of real property." Sweeney, 136 F.3d at 219. Unlike in Burford — where the state specifically sought to develop and apply a state agency's technical expertise in evaluating complex issues of geology and economics, see 319 U.S. at 326-27 — real property rights, though derived mainly from state law, are routinely enforced in federal as well as state courts. Especially in light of this historical pattern, we discern no principled reason for concluding that the state's interests would be jeopardized by allowing a federal court to resolve a garden-variety eviction action.[3]  Sweeney, 136 F.3d at 219.

---

[3] The incidence of the ongoing COVID-19 pandemic does not alter this conclusion. "In a variety of ways, federal courts enforce rights created by state law," Sweeney, 136 F.3d at 219, and there is no reason to believe that federal courts cannot apply whatever eviction-related policies may have evolved in response to the COVID-19 pandemic. We add, moreover, that the district court's concern over the difficulty of "anticipat[ing]" state-court exceptions to eviction proceedings is wide of the mark. Forty Six

- 15 -

We add a coda. A centerpiece of FSH's argument in support of abstention is the decision in <u>Federal Home Loan Mortgage Corporation</u> v. <u>Briggs</u>, 556 F. App'x 557 (8th Cir. 2014) (per curiam). <u>Briggs</u>, however, is too flimsy to support the weight that FSH loads upon it.

In <u>Briggs</u>, a panel of the Eighth Circuit upheld a district court's decision to abstain — on <u>Burford</u> grounds — from adjudicating an eviction action controlled by state procedures similar to those at issue here. <u>See</u> <u>id.</u> at 558. The <u>Briggs</u> court, though, did not have the benefit of briefing on the complexity or lack of complexity of the state procedural scheme and relied only on the lower court's analysis, <u>see</u> <u>id.</u> at 557-58, and we have found the lack of such complexity to be dispositive. In all events, <u>Briggs</u> is not controlling precedent even in the circuit of its birth, <u>see</u> 8th Cir. R. 32.1A, and we decline to follow it.

To say more about the abstention question would be to paint the lily. We conclude, without serious question, that the Massachusetts summary process scheme is not the kind of state administrative scheme that demands the protective shield of

---

<u>Hundred</u>, 478 F. Supp. at 87. Presumably, eviction cases heard in state court will outnumber those removed to federal court, and state law will develop with only negligible interruption. Besides, the very nature of those few eviction cases that may satisfy the statutory prerequisites for removal — such as this commercial eviction dispute — makes them less likely to implicate those questions.

- 16 -

_Burford_ abstention.  As we have said, it is not an intricate or complex state administrative scheme, nor does it pose difficult and unsettled questions of state law.  Given these conclusions and given the undisputed fact that FSH's suit against Cadence satisfied all the prerequisites for federal diversity jurisdiction, the district court was not entitled to shirk its duty to exercise jurisdiction over that suit.  See _Quackenbush_, 517 U.S. at 726-27; _Chico Serv. Station_, 633 F.3d at 29-30.

### III

Our reversal of the remand order ordinarily would require nothing more than a simple instruction to the district court to exercise its jurisdiction and adjudicate the action that FSH has brought against Cadence.  Here, however, there is a possible wrench in the works:  because the district court already has returned the action to the state court and the case has progressed (albeit modestly) in that forum, a question arises as to whether the ordinary remedy is still available.  Some background helps to put this question in perspective.

In _In re La Providencia Development Corp._, 406 F.2d 251 (1st Cir. 1969), we said that, in removal proceedings, "the state court proceedings are to be interfered with once" and only once. _Id._ at 252.  We subsequently reiterated this admonition in _FDIC_ v. _Santiago Plaza_, 598 F.2d 634 (1st Cir. 1979) (per curiam), stating that "once a district court has decided to remand a case and has

- 17 -

so notified the state court, the district judge is without power to take any further action."  Id. at 636.  These prescriptive statements — which also give us pause to consider our authority to review the remand order — are context-specific.  As we explain below, they do not apply in this case.

The quoted statements were made in, and applied only to, cases that fall within the compass of 28 U.S.C. § 1447(d) — a provision that forbids appellate review of certain remand orders.[4] Once the state court has resumed jurisdiction in such a case, a defendant is barred even from bringing a motion for reconsideration.  See id.

That one-shot rule, see In re La Providencia Dev., 406 F.2d at 253, does not inform our inquiry in this case.  After all, where section 1447(d) is not in play, following the one-shot rule would make little sense.  So it is here:  while section 1447(d) generally bars appellate review of remand orders "premised on a lack of subject matter jurisdiction or a defect in removal procedure," BP P.L.C. v. Mayor of Balt., 141 S. Ct. 1532, 1541 (2021) (explaining Court's holdings in Carlsbad Technology, Inc. v. HIF Bio, Inc., 556 U.S. 635, 638 (2009), and Thermtron Products,

_____

4 Section 1447(d) provides, with limited exceptions, that "[a]n order remanding a case to the State court from which it was removed is not reviewable on appeal or otherwise . . . ."  28 U.S.C. § 1447(d); see BP P.L.C. v. Mayor of Balt., 141 S. Ct. 1532, 1536-37 (2021).

- 18 -

Inc. v. Hermansdorfer, 423 U.S. 336, 345-46 (1976)), the Supreme Court (in reviewing the history of section 1447) has determined that "[t]here is no indication whatsoever that Congress intended to extend the prohibition against review to reach remand orders entered on grounds not provided by the statute," Thermtron, 423 U.S. at 350; see BP P.L.C., 141 S. Ct. at 1541 (noting that Court precedent "permitted rather than foreclosed appellate review of certain remand orders"). The Court's "strong statement" that remand orders beyond the reach of section 1447 are reviewable "suggests that it would not countenance a district court evading review by immediately transmitting its remand order to the state court." Acad. of Country Music v. Cont'l Cas. Co., 991 F.3d 1059, 1063 (9th Cir. 2021).

The Quackenbush Court determined that abstention-based remand orders were not only beyond the reach of section 1447(d) but also immediately appealable under section 1291. See 517 U.S. at 712-15. In such cases, allowing a district court to render the permitted appeal nugatory by prematurely returning the case to the state court would defeat the very purpose of permitting an appeal and leave a defendant who prevails on appeal holding an empty bag. Neither Supreme Court precedent nor our own case law demands so illogical a result.

We are mindful that some modest proceedings have taken place in state court. Given the inapplicability of the one-shot

- 19 -

rule, however, we do not think that this fact alone should either defenestrate Cadence's entitlement to be heard in federal court or alter the outcome of this appeal. And although FSH argues that Cadence has "taken advantage" of the state court's jurisdiction, that argument comprises more cry than wool.

Importantly, there is no question of waiver or estoppel here. Cadence has at all times acted expeditiously to preserve its right to a federal forum. For instance, Cadence promptly asked the district court to stay its remand order and — when that stay was denied — promptly asked this court for a stay. That no stay was ordered by this court was not a function of any lack of diligence on Cadence's part but, rather, was a function of the district court's premature return of the action to the state court. Nor do general considerations of comity seem adequate to override Cadence's entitlement to a federal forum, especially since the state-court proceedings are still in their early stages and no judgment has yet been entered.

Even though we are confident that this case's uneventful time in state court neither affects the merits of Cadence's appeal nor the remedy we invoke, we have been unable to identify any formal procedural mechanism for the retrieval of a removed case erroneously returned to a state court. We see no reason, though, why general principles of comity, cooperation, and communication

between state and federal courts are inadequate to bridge this procedural gap.

The case law abounds with examples of federal courts using informal processes to retrieve improvidently remanded cases from state courts. An example can be gleaned from our decision in Connolly v. H.D. Goodall Hospital, Inc., 427 F.3d 127 (1st Cir. 2005). There, the district court ordered a remand, which the clerk of court then executed. See id. at 128. But when the removing defendant filed a notice of appeal, the district court "issued a procedural order vacating its already-effectuated remand as 'premature.'" Id. In addition, the court "direct[ed] its clerk to recall the case from the state court." Id. Acting on that directive, "[t]he clerk complied and the state court cooperated," and the case was re-docketed in the district court. Id.

So, too, in a case in which a district court had already transmitted its sua sponte remand order to a state court, the Ninth Circuit determined both that federal jurisdiction was not forfeited and that review of the order was not pretermitted by section 1447(d). See Acad. of Country Music, 991 F.3d at 1070. It subsequently held that the district court's decision to remand based on section 1447(c) exceeded the scope of such statutory authority and vacated the remand order. See id. at 1069-70. The court did not deem the retrieval of the case to be an insurmountable obstacle but, rather, concluded its opinion by

directing that "[t]he district court shall enter an order recalling the remand and shall notify the [state court] that the district court has resumed jurisdiction over the action." Id. at 1070; see Reddam v. KPMG LLP, 457 F.3d 1054, 1062 (9th Cir. 2006) (entering similar direction upon reversal of remand order in case prematurely returned to state court).

Our decision in Alstom Caribe, Inc. v. Geo. P. Reintjes Co., 484 F.3d 106 (1st Cir. 2007), involved the possible need for retrieval of funds improvidently transferred from one federal district court to another. Although not involving the retrieval of a case from a state court, this decision furnishes a compelling analogy. There, the district court ordered the deposit of disputed funds into its registry and then transferred the funds — but not the case — to a district court in a different circuit. See id. at 110-11. By the time we heard the appeal, the funds had been "physically transferred to the Western District of Missouri" and "that court ha[d] assumed control over them." Id. at 116. We acknowledged that "we [had] no authority to order a district court in another circuit" to return previously transferred funds but — because a party's rights were at stake — "we fe[lt] confident that we c[ould] rely on the district courts in the two affected districts to act cooperatively so that the ends of justice w[ould] be served." Id. We left it up to the district court — should a retransfer of the funds prove necessary — "to advise the transferee

court that the deposited funds were transferred improvidently and request their return." Id.

These examples point the way toward the appropriate remedy in this case. As we already have determined, the district court's remand order was in error. See supra Part II. Thus, Cadence is entitled to defend against FSH's action in the federal district court. There is a long and storied history of comity and cooperation between state and federal courts in this circuit. Given that history, we are confident that the district court can enlist the state court's cooperation and restore the action to its own docket (where the case belongs). In the exercise of our supervisory authority, we direct the district court to undertake this retrieval forthwith.

## IV

We offer some guidance to district courts to help prevent a removed case from becoming a shuttlecock, batted back and forth between a state court and a federal court.

If a motion to remand is granted by the district court in a removed case and the remand order is appealable, the district court may wish to avoid immediately certifying the remand order and returning the case file to the state court until it believes the specter of shuttling has abated. A district court would be well-advised, for example, to hold the matter in abeyance for a brief period or to direct the clerk of court to delay transmittal

of the certified remand order.  Either course of action would give the removing party an opportunity to move for a stay, to seek reconsideration, and/or to appeal the order and request a stay from the court of appeals.

The variety of approaches in the federal court system dealing with similar issues illustrates that, although there may not be a single best method, an important common denominator is that counsel be made aware of these temporal constraints.  The court may do so either formally (say, by adoption of a local rule or publicly available operating procedure) or informally (by acquainting counsel, on an ad hoc case-by-case basis, with its timeline).  The United States District Court for the Eastern District of Texas, for instance, requires that its clerk of court wait at least twenty days following entry of a remand order before returning the case file.  See Eastern District of Texas Local Civil Rule 83(b); see also Gunter v. Jay Ayers, Inc., No. 10-354, 2011 WL 13217086, at *1 n.1 (E.D. Tex. Mar. 8, 2011) (acknowledging that rule helps avoid a snafu where parties may like to object to a magistrate judge's ruling on a motion to remand within the time period allotted for filing objections).  Another district court has promulgated a local rule requiring that its clerk of court wait fourteen days before transmitting a certified copy of a remand order pursuant to section 1447(c).  See Northern District of Illinois Local Rule 81.2.  Other district courts have devised more

informal approaches tailored to the circumstances of particular cases.  See, e.g., Reiber v. Cnty. of Gage, No. 15-3023, 2016 WL 2596025, at *2 n.2 (D. Neb. May 5, 2016) (noting "for the parties' convenience, that [the] remand order is appealable" and advising that the court "will, unless notified by all remaining parties that they wish to expedite remand to state court, stay its transmittal of the case for 30 business days to permit sufficient time for an appeal").  In the end, it is the district court's province to manage its dockets.  See United States v. Ottens, 74 F.3d 357, 359 (1st Cir. 1996).  And it is that court's charge to do so fairly and efficiently.

**V**

We need go no further.  For the reasons elucidated above, we reverse the district court's remand order and remand the matter to the district court with directions to resume jurisdiction, retrieve the action forthwith from the state court, and thereafter to proceed in the ordinary course.  Costs shall be taxed in favor of Cadence.


**So Ordered**.